**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRIDENT CAPITAL GROUP FUND I LLC,<br><br><br>                    Plaintiff,<br><br>   -against-<br><br>THE NASDAQ STOCK MARKET, LLC, BENJAMIN HASKELL, NIKOLAI UTOCHKIN, EUN AH CHOI, AND ARNOLD GOLUB, and STANLEY HIGGINS,<br><br>                    Defendants. | Case No.: 24-cv-2318<br><br>**COMPLAINT** |

Trident Capital Group Fund I LLC (**"Trident"**), an investor in Minority Equality Opportunities Acquisition, Inc. (**"MEOA"** or **"Company"**), brings this action for damages against Defendants The NASDAQ Stock Market, LLC (**"The NASDAQ Stock Market"** of **"NASDAQ"**), Benjamin Haskell (**"Haskell"**), Nikolai Utochkin (**"Utochkin"**), Eun Ah Choi (**"Choi"**), Arnold Golub (**"Golub"**), and Stanley Higgins (**"Higgins"**) (collectively, the **"Defendants"**).  Trident prays for judgment against the Defendants for:

- Arbitrarily and capriciously abusing their discretion to block the Business Combination (defined below) between MEOA and Digerati Technologies, Inc., two companies led by Black Americans and Hispanic Americans;

- Violation of the Equal Protection Clause of the United States Constitution by using a more stringent and previously unstated standard to evaluate the MEOA Business Combination without providing a reasonable, market-centric reason for treating MEOA differently, while applying a less rigorous standard to three majority-led companies involved in similar business combination transactions; and

- Tortious interference with advantageous business relationships by (1) substituting its valuation methodology for MEOA's Business Combination in lieu of MEOA's valuation of Digerati Technologies which was supported by a Fairness Opinion (defined below) prepared by an independent firm that specializes in corporate valuations; and (2) halting trading in the Company's

securities on the eve of the Business Combination's scheduled closing date for an extended, unspecified period which effectively led to the termination of the business opportunity.  The trading halt made it nearly impossible to produce alternative solutions, despite no evidence of wrongdoing by the Company or its officers, directors, or stakeholders.

Trident alleges the following upon information and belief:

## PARTIES

1.      Trident is a Delaware limited liability company with its principal place of business in Southbury, Connecticut.  Some of Trident's members reside in the Eastern District of New York. Trident held a 17.67% interest in the SPAC Sponsor as of August 31, 2021, pursuant to investments by its members.

2.      The NASDAQ Stock Market LLC is a for profit, Delaware limited liability company with its principal place of business at One Liberty Plaza, New York, New York. NASDAQ is a registered national securities exchange that operates as an electronic stock market and offers securities listing, trading and information products and services.  The NASDAQ Stock Market earned a gross profit of approximately $3.895 billion for the fiscal year ended December 31, 2023.

3.      Defendant Benjamin Haskell has been, at all times relevant to this Complaint, an Associate Vice President and Managing Directors, Head of U.S. Initial Listings and Structured Products at The NASDAQ Stock Market.  Mr. Haskell led a team responsible for reviewing company applications for initial listing on NASDAQ and overseeing initial and continued listing compliance program for Exchange Traded Products.  Mr. Haskell played an integral role in evaluating the Business Combination.

4.      Defendant Nikolai Utochkin has been, at all times relevant to this Complaint, Counsel for Listing and Governance at The NASDAQ Stock Market.  Mr. Utochkin is an employee at NASDAQ who evaluated the Business Combination.

5.      Defendant Eun Ah Choi has been, at all times relevant to this Complaint, Senior Vice President, U.S. Head of Listing Qualifications and Market Surveillance at The NASDAQ Stock Market.  Ms. Choi is an employee at NASDAQ who evaluated the Business Combination.

6.      Defendant Arnold Golub has been, at all times relevant to this Complaint, Vice President and Deputy General Counsel at The NASDAQ Stock Market.  Mr. Golub is an employee at NASDAQ who evaluated who evaluated the Business Combination.

7.      Defendant Stanley Higgins has been, at all times relevant to this Complaint, Associate Vice President, Nasdaq Regulation from The Nasdaq Market Watch.  Mr. Higgins is an employee at NASDAQ who evaluated the Business Combination.

## JURISDICTION AND VENUE

8.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and the parties are citizens of different states. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.      Venue is proper under 28 U.S.C. § 1391(b)(2) and (c)(2) because a substantial part of the property that is the subject of the action is situated in New York, New York, and its surrounding metropolitan area.

**GENERAL ALLEGATIONS**

***Overview of the Case***

**A.  *Minority Business Enterprises are Starved for Capital and MEOA Provided a Near-Term Solution to a Pervasive Problem Until NASDAQ's Arbitrary, Capricious, and Discriminatory Conduct Scuttled the Business Combination***

10.     Access to capital is critical to economic liberty.  Historically, Black Americans and other underrepresented groups have struggled to access capital.  This limitation has adversely impacted Black American's pursuit of the American Dream.  Few Black Americans have leveraged the U.S. capital markets to grow a public company at scale.

11.     Minority business enterprises (**"MBE"**)[1] have a strong commitment to and are often the backbone of local communities where they operate.  As of the 2020 census, approximately 1.2 million MBEs operated across the United States, which represented 20% of all employers.  During that period, MBEs employed approximately 9.9 million Americans, which accounted for over $357.4 billion in payroll.[2]  MBEs are also fertile ground for highly educated and experienced managerial and executive level talent who have an ardent desire to work for companies that are diverse in terms of workforce, ownership, and supply chain.[3]

12.     Despite these positive attributes and the increasing demand for their products and services, MBEs lack capital necessary to meet the demands of the markets in which they compete.  In 2021, the Federal Reserve found that 25% and 15% of Black and Hispanic-owned businesses,

---

[1] MBEs are business enterprises that are at least 51% owned by Black, Hispanic, Asian or Native Americans.

[2] https://www.census.gov/library/stories/2023/01/who-owns-americas-businesses.html.

[3] Kristopher Brooks, "Why So Many Black Professionals are Missing from the C-Suite", *MoneyWatch,* Dec. 10, 2019 (noting that Black people account for about 12% of the U.S. population but occupy only 3.2% of the senior leadership roles at large companies in the U.S. and just 0.8% of all Fortune 500 CEO positions); *see also* Pamela Newkirk, Diversity Has Become a Booming Business.  So Where are the Results? *Time*, Oct. 10, 2019 (noting that from 1985 to 2016, the proportion of Black men in management at U.S. companies with 100 or more employees barely budged‑from 3% to 3.2%.).

respectively, were labeled as high credit risk, while only 6% of White-owned firms had the same

risk profile.[4]  Minority-owned firms were more likely to receive no financing, largely due to fewer

collateral options, stringent underwriting criteria, fewer banking relationships, and misaligned

incentives.[5]  A senior banking executive noted that "despite . . . recent strides, it's still harder to

launch a business and stay afloat as a black entrepreneur.  Some 57% of Black business owners

surveyed expressed concern about credit availability – and 40% of Black business owners do not

think they will ever have access to capital."[6]  Lack of capital stifles MBE's ability to scale and

drive sustained transformative revenue growth.

13.    MEOA sought to use a special purpose acquisition company (**"SPAC"**) as a vehicle

to unleash the flow of capital to minority businesses and fulfill its underlying mission to bridge the

racial wealth gap.  MEOA planned to merge with companies owned, operated, or founded by

Black, Hispanic, other traditionally unrepresented groups, or companies that directly impact the

lives and economic status of these groups.

14.    MEOA aimed to complete a business combination with Digerati Technologies, Inc.

(**"Digerati"**), a Nevada corporation, which traded on the over-the-counter market (**"OTC"**).  A

successful business combination would have enabled the combined company to trade on The

---

[4] Gabe Horowitz, Stephanie DeVane, and Madeline Burke, "2023 Vital Signs: The Health of Minority-Owned Small Businesses", *Third Way*, Jan. 18, 2023, citing Board of Governors of the Federal Reserve System (U.S.)  "Small Business Credit Survey: 2022 Report on Firms Owned by People of Color." *Fed. Small Business*. https://www.fedsmallbusiness.org/survey/2022/2022-report-on-firms-owned-by-people-of-color, p. 15.  See also, Board of Governors of the Federal Reserve System (U.S.)  Small Business Credit Survey: 2021 Report on Firms Owned by People of Color.  *Fed. Small Business*.  https://www.fedsmallbusiness.org/survey/2021/2021-report-on-firms-owned-by-people-of-color, p. 28.

[5] Augustus, Imani. "Five Reasons Minority Borrowers Can't Access Capital." *Third Way.*  September 28,  2022, https://www.aeequity.org/product/five-reasons-minority-borrowers-cant-access-capital.

[6] D. Steve Boland, Bank of America: 'Black-owned businesses are growing – but they need our continued support to thrive', *Fortune*, Feb. 9, 2023, https://fortune.com/2023/02/09/bank-of-america-black-owned-businesses-growing-access-to-capital-banks-d-steve-boland/.

NASDAQ Stock Market.  MEOA favored listing on The NASDAQ Stock Market because its mission and board composition aligned with NASDAQ's widely trumpeted position favoring board diversity and requiring listed companies to "have one director who identifies as female, a member of an underrepresented racial or ethnic minority, or LGBTQ…".[7]  In fact, NASDAQ's landing page on LinkedIn says **"Question Today Rewrite Tomorrow"**[8] and "[a]t Nasdaq, our purpose is to advance economic progress for all. We power stronger economies, create more equitable opportunities, and contribute to a more sustainable world to help our communities, clients, employees, and people of all backgrounds reach their full potential."[9]

15.     Digerati was an ideal fit to MEOA's mission because it was a minority-founded, led, and controlled high growth technology company with an employee base that was 50% minority and was recognized as one of the fastest growing technology companies in North America.

16.     Unfortunately, NASDAQ effectively repriced a transaction that was heavily negotiated by experienced finance, legal and operations professionals with insight from three investment banks, and approved by three, independent, public company board directors with hundreds of years of combined experience.

17.     NASDAQ, through a succession of targeted, discriminatory and capricious actions effectively rewrote the rules by which the SPAC market had understood a business combination

---

[7] See Press Release Re Board Diversity Requirements. https://www.nasdaq.com/articles/u.s.-court-upholds-nasdaq-board-diversity-rule#:~:text=The%20rule%20requires%20companies%20to,satisfy%20the%20rule%20by%202026.

[8] See https://www.linkedin.com/company/nasdaq/.

[9] Id.

would occur by (1) questioning the gap/premium[10] between MEOA's valuation of Digerati's equity and Digerati's publicly traded price on the OTC, even though MEOA had already explained this gap/premium in a detailed and extensive manner in its S-4 registration statement which had previously been reviewed, commented on, and made effective by the SEC; (2) halting trading in MEOA's stock indefinitely[11] thereby eliminating MEOA's ability to use its share price to determine whether the combined entity met the applicable initial listing standards; (3) refusing to accept MEOA's valuation of Digerati, even though it had been supported by an independent fairness opinion and agreed to by the boards of directors of both MEOA and Digerati companies; (4) falsely asserting[12] that the SEC required it to use a target company's public trading price[13] and forcing MEOA to use a grossly undervalued[14] OTC price for Digerati to meet its initial listing standards; (5) causing maximum damage to the combined company's ability to meet NASDAQ's new listing requirement by informing MEOA of its decision to require MEOA to use Digerati's OTC price one

---

[10] MEOA responded to NASDAQ's question with a detailed explanation of the premium and provided three examples of other SPAC business combinations with targets from the OTC and junior exchanges that were allowed to uplist to NASDAQ that had premiums significantly above Digerati's and ranged from 40% to almost 600% above their respective publicly traded price.

[11] MEOA responded by providing four examples of SPACs that experienced large increases in share price, ranging from 107% to 250%, in the days leading up to the closing of their business combination that were not halted and still allowed to uplist to NASDAQ. NASDAQ's treatment of MEOA by halting its stock indefinitely was so egregious, that of the 13,707 stock halts that NASDAQ initiated in 2023, 99.73% of them lasted less than one-week. MEOAs stock halt was the only one that lasted more than seven weeks.

[12] NASDAQ's false assertion was made to MEOA after MEOA's S-4 registration statement had been reviewed, approved and made effective by the SEC, following a detailed and intensive five month SEC review process where the SEC made no mention of its requirement for NASDAQ to require MEOA to use Digerati's OTC price. In fact, none of the SEC's 29 comments during its intensive 5-month review of MEOA's S-4 registration statement mentioned this alleged requirement and the SEC did not require MEOA to disclose it as important risk factor to its shareholders.

[13] NASDAQ's decision was inconsistent because The NASDAQ Stock Market it halted MEOA's stock indefinitely due to volatility driven by low levels of liquidity, but then required MEOA to use Digerati's price on the OTC where it was subjected to extremely low levels of liquidity that prevented effective price discovery.

[14] MEOA shared with NASDAQ that, Digerati's valuation on the OTC was so problematic, that when the firm that conducted its fairness opinion analyzed Digerati's liquidity on the OTC, it was found to be so illiquid that Digerati's OTC price could not be effectively used to value Digerati.

day before MEOA's scheduled shareholder meeting to vote on its Business Combination, and just days before the projected closing of its Business Combination despite already having had MEOA's listing application for six months;[15] (6) causing many weeks of unnecessary delays and eroding market confidence in MEOA' business combination with Digerati; (7) trapping MEOA public shareholders in trades that they could not exit and causing irreparable damage to MEOA's reputation in the marketplace by giving the impression that MEOA had done something wrong; (8) contributing to the lowering of Digerati's share price on the OTC below a level where an intensive restructuring of the Business Combination could not meet NASDAQ's listing standards thereby culminating in MEOA having to abandon its Business Combination with Digerati and redeem its public shares and liquidate; and (9) destroying massive amounts of shareholder value and preventing MEOA from demonstrating to future investors, sponsors, capital allocators that business combinations between minority-led SPACs and target companies could succeed and be an effective way to channel public and private capital to minority-founded, led, or impacting companies, to help maximize their ability to execute their strategic imperatives, accelerate growth and create jobs that would help strengthen the American economy. NASDAQ blocked MEOA's ability to complete its Business Combination with Digerati, and in doing so, NASDAQ violated MEOA's right to Equal Protection under the United States Constitution, stifled MEOA's prospective economic relationships, and caused damages in an amount to be determined at trial.

18.     Sphere 3D Corporation (**"Sphere"),** a Toronto-based company, sought to disrupt this paradigm.  Sphere filed MEOA's certificate of incorporation with the Secretary of State of

---

[15] During this six-month period, NASDAQ did not provide any guidance to MEOA or the broader SPAC market directly or via its Frequently Asked Questions (FAQ) process regarding its requirement to force SPACs to use the publicly traded price of a target company. It was not until three days after MEOA announced that it would redeem its public shares and liquidate that Nasdaq updated its FAQ to reflect this new policy.  And in this **new FAQ** NASDAQ stated that it "*generally relies on the trading price* of the publicly traded target company…" which is mild language compared to the intransigent, unrelenting and absolute position it took with respect to MEOA.

Delaware on February 18, 2021 (and an amended and restated certificate on August 25, 2021). Months later, in or about April 2021, Sphere sponsored MEOA through its wholly owned subsidiary, Minority Equality Opportunities Acquisition Sponsor, LLC (**"SPAC Sponsor"**), as part of its dedication to position minority owned businesses for accelerated growth.

19.     On or about May 15, 2021, Sphere filed a confidential draft registration statement with the United States Securities and Exchange Commission (**"SEC"**) to create a blank check company (also known as a special purpose acquisition company) incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses.

20.     MEOA described the Company's business plan in detail in its Form S-1.  MEOA disclosed that it was agnostic about its initial business combination target in terms of line of business, industry or geographic location, but its initial focus was on transactions with companies that are MBEs so that immediately following the completion of an initial business combination the combined company would qualify as an MBE.  MEOA sought to acquire MBEs whose enterprise value ranged from $250 million to $500 million.

### B. MEOA Management Team and Advisors

21.     MEOA assembled a strong management team with experience in acquisitions, financings, and advisory transactions, totaling millions in transaction value, and experience executing deals in a variety of economic cycles and jurisdictions. Collectively, MEOA's management team had experience originating and structuring transactions, and they planned to leverage their relationships to develop a pipeline of overlooked business combination opportunities.

22.    Sphere appointed Shawn Rochester and Robin Watkins as MEOA's CEO and CFO, respectively.  Mr. Rochester is a seasoned corporate development and strategy executive who has extensive strategic planning experience with industry leading organizations; executed transactions globally and evaluated scores of acquisition targets; and a deep understanding of the global competitive landscape.  Mr. Rochester served as the Global Director of New Business Development for Amphenol Corporation, where he was responsible for mergers and acquisitions. Enlisting Mr. Rochester as CEO would have represented progress given the scant of Black Americans who have ascended to the role of CEO of a public company.[16]

23.    Ms. Watkins, a certified public accountant, has more than twenty years of strategic financial and operational accounting expertise.  She held senior positions at Deloitte LLP and PricewaterhouseCoopers, where she honed her skills in financial risk mitigation assessment, internal controls, and corporate compliance.

24.    MEOA's initial directors included Dr. Julianne Malveaux, an MIT economist and Dean of the College of Ethnic Studies at California State in Los Angeles; Ronald Busby, Sr., President and CEO of the U.S. Black Chambers, Inc.; and Patrick Linehan, a partner at the law firm Steptoe & Johnson.  MEOA was the sole NASDAQ-listed SPAC whose leadership was majority-minority.[17]

---

[16] Phil Wahba, "The 19 Black CEOs That Have Led Fortune 500 Companies Since 1955, *Fortune*, Feb. 1, 2021, https://fortune.com/longform/fortune-500-black-ceos-business-history/ (noting that as of February 1, 2021, "in the history of the Fortune 500 list, there have only been 19 Black CEOs out of 1,800 chiefs."

See also, Paige McGlauflin, Black CEOs on the Fortune 500 Reach New Record High in 2023 – Meet the 8 Executives, Fortune, June 5, 2023, https://finance.yahoo.com/news/black-ceos-fortune-500-reach-093100572.html? (As of June 5, 2023, there were 8 Black CEOs on the Fortune 500 which represented 1.6% of all Fortune 500 CEOs and there have only been 25 Black CEO out of more than 1800 Fortune 500 chiefs in the history of the Fortune 500 list).

[17] Carey Oven, Caroline Schoenecker and Cid Wilson, Board Diversity Census on Fortune 500 Boards, *Harvard Law School Forum on Corporate Governance*, Friday, July 28, 2023; https://corpgov.law.harvard.edu/2023/07/28/board-diversity-census-on-fortune-500-boards/.  The article notes that "individuals from underrepresented racial and ethnic groups [**UR&EG**] hold 22.2% of board seats across Fortune 500 companies. This is certainly an improvement from

25.     MEOA also recruited merger and acquisition and private equity veterans to its advisory team to generate opportunities for the Company and to bolster the market's confidence in a transaction.  Stewart Kim of PGP Capital Advisors and Craig Vaughan of Vaughan Capital Advisors advised the Company in connection with its business combination search and transaction execution. Highland Poe, a Black-owned corporate advisory services firm, provided strategic advice to Sphere and MEOA during its business combination search process.  HP Global Advisors, Maxim Group and Pryor Cashman LLP, an AmLaw 200 law firm, advised MEOA during its public offering.

26.     MEOA successfully navigated the SEC's initial public offering process, and its registration statement became effective July 28, 2021.  The initial public offering closed on August 30, 2021.  Market activity showed overwhelming support for MEOA, resulting in the public offering being oversubscribed.  MEOA issued more than 10 million units and raised $126.5 million from public shareholders.

27.     Like many blank check companies, each unit had an offering price of $10.00 and consisted of one share of MEOA Class A common stock and one redeemable warrant. Each warrant entitled the holder to purchase one share of MEOA's Class A common stock at a price of $11.50 per share, subject to adjustment as described in its prospectus. The warrants were exercisable on the later of 30 days after the completion of MEOA's initial business combination or 12 months after the closing of its initial public offering.  The warrants would expire five years after the completion of MEOA's initial business combination or earlier upon redemption or liquidation.

---

2020, when the proportion of UR&EG board members was 17.5%. However, United States census data shows 40.6% of the nation's population is from underrepresented racial and ethnic groups.  At the current pace, it would take the boards of Fortune 500 companies more than two decades for board representation to match the current level of representation of individuals from underrepresented racial and ethnic groups in the population.

28.     MEOA's public stockholders could redeem all or a portion of their shares of Class A common stock upon the completion of its initial business combination, subject to certain limitations as described in the prospectus.  And, if MEOA was unable to complete an initial business combination within twelve months of the effective date of the registration statement (or a later date if MEOA chose to extend the business combination period), MEOA would redeem 100% of the public shares for cash, subject to applicable law and certain conditions described in its prospectus.

29.     MEOA subsequently applied for and received approval to list its common stock and warrants on The NASDAQ Capital Market under the symbols **"MEOA"** and **"MEOAW,"** respectively.  MEOA ultimately had until May 30, 2023 (the **"Initial Closing Date"**) to complete a business combination unless it was unable to extend the deadline via paying an extension fee.

30.     Since its public offering, MEOA timely filed all disclosure statements, forms, reports, and documents with the SEC.  Its SEC filings complied in all material respects with the applicable requirements of the federal securities laws applicable to MEOA.  As of the date of each filing, MEOA's SEC filings did not contain any untrue statement of material fact or any material omission.  Yet, despite MEOA's regulatory compliance and its mission, NASDAQ inexplicably blocked the Company from listing on its exchange without justification.

## DETAILED ALLEGATIONS

### A.  The Business Combination and Regulatory Approval Process

31.     MEOA's management targeted Digerati for a business combination. While Digerati is not an MBE, its leadership team, directors, and workforce were primarily Hispanic American.

32.     Under the leadership of CEO Arthur Smith and CFO Antonio Estrada, Jr., Digerati provided cloud services specializing in unified communication as a service and broadband

connectivity solutions to the business market. Digerati's services include a portfolio of internet-based telephone products and services delivered through a cloud application platform and session-based communications networks. Its network services includes internet broadband, mobile broadband, and cloud WAN solutions, along with enterprise-class, carrier-grade services to small-to-medium-sized businesses at cost-effective monthly rates.

33.     On August 30, 2022, the boards of directors of MEOA and Digerati, respectively, approved a business combination by and among MEOA and MEOA Merger Sub, Inc. (**Merger Sub"**), a Delaware incorporated, wholly owned subsidiary of MEOA (**"Business Combination Agreement"**). The Business Combination Agreement provided, among other things, that the Merger Sub would merge with and into Digerati through an all-stock transaction and that Digerati would be a wholly owned subsidiary of MEOA (the **"Business Combination"**). The initial equity value of the combined company would be approximately $228 million, which amounted to an enterprise value of approximately $145 million, assuming no redemptions from MEOA's shareholders. The merged companies' stock needed to be traded on a public exchange to close the Business Combination. Accordingly, MEOA pursued a dual-track regulatory approval process to list Digerati on The NASDAQ Stock Market after executing the Business Combination Agreement.

### B.   The SEC Approval Process

34.     On November 30, 2022, MEOA submitted its initial registration statement for the merged company to the SEC. By January 4, 2023, the SEC sought information regarding MEOA's Form S-4, the Business Combination, the interested parties, and Digerati's implied equity value as compared to its market capitalization on the OTC.

35.     MEOA timely responded to the SEC's questions regarding the Business Combination and submitted an analysis by Newbridge Securities Corporation (**"Newbridge**

**Securities"**) to support the implied equity valuation (**"Fairness Opinion"**).  Newbridge Securities is an independent third party with experience opining on transactions like the Business Combination.  The Fairness Opinion entailed, among other things, reviewing drafts of the Business Combination Agreement and related transaction documents; reviewing public information, historical financial results, and the trading potential for MEOA securities; reviewing MEOA's SEC filings; and analyzing a financial model of Digerati featuring historical and future projections (e.g., revenue growth and EBITDA margins).   The Fairness Opinion also included analyses of discounted cash flow models and comparable transactions.

36.     On April 28, 2023, the SEC allowed MEOA's registration statement for the business combination to become effective.

37.     MEOA then prepared to complete the Business Combination by May 26, 2023 and list on The NASDAQ Global Market. Unfortunately for MEOA, and the many diverse businesses that would benefit from its business model, NASDAQ used its delegated authority arbitrarily and capriciously shackle the Company and ultimately prevented its ability to close the Business Combination.

### C.  *The NASDAQ Listing Process Was Arbitrary, Capricious and Discriminatory*

38.     Concurrent with submission of its registration statement to the SEC, on December 5, 2022, MEOA submitted its application to list the combined company on The NASDAQ Stock Market.  MEOA anticipated that NASDAQ's review process would be completed within the customary period between MEOA and Digerati's respective shareholder meetings to adopt and approve the Business Combination Agreement and the closing of the Business Combination, barring material and identifiable deficiencies in its submissions.

14

39.     NASDAQ's review process began innocuously.   On information and belief, NASDAQ tasked Messrs. Haskell, Utochkin, Golub, and Ms. Choi (collectively, the **"Listing Team"**) to review MEOA's application.  On January 4, 2023, NASDAQ provided comments to MEOA regarding its application.  NASDAQ also sought a range of information from MEOA regarding the business combination, including, among other things, MEOA's correspondence with the SEC; information involving active litigation; the source of funds in MEOA's trust account; the composition of the combined company's board of directors; the expected date of initial trading for the merged company; the total shares outstanding versus publicly tradable shares of the merged company; round lot analysis; a share redemption schedule; a non-objecting list of beneficial owners; and a Broadridge share range analysis.  NASDAQ's requests were routine, and NASDAQ identified no gating issues or other mandates that would prevent MEOA's Business Combination from closing.  Critically important, NASDAQ made no reference to a requirement that MEOA must use the price of Digerati's publicly traded security to value the combined company.

40.     Between January 4, 2023 and April 17, 2023, NASDAQ and MEOA exchanged comments and responses about the Business Combination.  MEOA supplemented its responses on or about May 15, 2023 in response to specific follow-on questions from NASDAQ regarding the total shares outstanding, the publicly tradable shares, the Broadridge share analysis, and the round lot analysis. NASDAQ's additional requests, which were sent to MEOA approximately ten days before its Initial Closing Date, challenged the methodology of the Fairness Opinion; halted all trading in MEOA's securities purportedly due to excessive volatility; and mandated use of Digerati's OTC price despite the limitations associated with the OTC market.[18]  Accordingly,

---

[18] The limitations include: (1) OTC stocks having less trade liquidity due to low volume, which leads to delays in finalizing the trade and wide bid-ask spreads; (2) the OTC market has less available public information because it receives less coverage and is perceived to have a higher incidence of fraud; and (3) OTC stocks are prone to volatility on the release of market and economic data.

NASDAQ's routine process quickly morphed into a multi-pronged assault to scuttle the Business Combination as opposed to an effort to seek information to protect the market and the public.

41.     Dissatisfied by MEOA's responses to date, on May 16, 2023, NASDAQ again questioned the valuation price of the combined company.  NASDAQ asked MEOA to explain the inconsistency between the valuation of $68,680,800 in the Fairness Opinion (i.e., $10 per share) and NASDAQ's internal valuation of Digerati's equity at $37,293,674 (i.e., $5.43 per share).

42.     NASDAQ's request was startling for two reasons.  One, MEOA's board of directors had reviewed Digerati's valuation and the supporting Fairness Opinion and authorized the execution of the Business Combination Agreement.  Two, MEOA had provided its SEC files to NASDAQ and MEOA's SEC disclosures included the Fairness Opinion, which described its valuation methodology in detail.  The SEC had already conducted an intensive five month review of MEOA's registration statement which included a detailed explanation of the gap/premium between MEOA's valuation that had been supported by the Fairness Opinion and the valuation of Digerati's equity on the OTC and allowed the registration statement to become effective as a result. Neither Mr. Haskell nor any member of the Listing Team could explain NASDAQ's rationale for challenging the valuation methodology beyond the SEC's inquiry into the same issue.

43.     NASDAQ did not wait for answers to its valuation inquiry.  On May 19, 2023, NASDAQ insisted that MEOA provide a detailed narrative of the discounted cash flow analysis layered into MEOA's financial model and whether the OTC price was taken into account and a detailed narrative of the public company comparable analysis of similar companies and the enterprise value / EBITDA multiples. NASDAQ's motivation was suspect because enterprise value / EBITDA multiples is one of a handful of commonly applied metrics in the category of public company analysis and a target company's share price is ordinarily not factored into forecasted

post-closing valuations. Nevertheless, MEOA diligently responded to NASDAQ's follow-on requests, recognizing that NASDAQ held absolute power to approve the Business Combination and list the Company on The NASDAQ Stock Market.

44.     Several days later, NASDAQ launched the second prong of its assault to undermine the Business Combination which dealt a mortal wound to MEOA's listing application. On or about May 24, 2023, NASDAQ notified the Company that it would only accept Digerati's OTC price to value the Business Combination. The Listing Team refused to relent regarding use of the OTC price. MEOA's advisors, including seasoned former employees at The NASDAQ Stock Market who were accustomed to dealing with similar transactions, were stunned by NASDAQ's inflexibility. NASDAQ offered no SEC statute, regulation or NASDAQ interpretative guidance, standard, policy or practice which stated that in a business combination involving a SPAC, the SPAC must use the publicly traded price of the target company for valuation purposes.

45.     And, in fact, NASDAQ's reasoning toward MEOA was a flagrant departure from NASDAQ's previous treatment of other business combination transactions involving publicly traded companies seeking to uplist from a junior exchange to NASDAQ. MEOA provided three examples where NASDAQ did not require use of the public price, including Lionheart III Corp (**NASDAQ; LION**), Mount Rainier Acquisition Corp. (**NASDAQ; RNER**); and Bull Horn Holdings Corp. (**NASDAQ; BHSE**). Each of these companies uplisted from a junior exchange to NASDAQ in 2023 and did not use the publicly traded price of the target company. On information and belief, none of these companies were MBEs or led by Blacks, Hispanics, or other underrepresented groups.

46.     Almost simultaneously, NASDAQ questioned why MEOA's share price had risen from $10.75 per share to $40.25 per share. NASDAQ did not wait for an answer from MEOA.

Instead, on May 25, 2023, NASDAQ halted all trading in MEOA's securities until the Company completed the Business Combination.  NASDAQ's claimed excuse was that the MEOA's stock had become too volatile.[19]

47.     NASDAQ's decision was unprecedented given the context.  Admittedly, NASDAQ has broad discretion regarding listing securities on The NASDAQ Stock Market. NASDAQ Rule 5101 states that:

> NASDAQ . . . has broad discretionary authority over the initial and continued listing of securities in NASDAQ in order to maintain the quality of and public confidence in its market, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and to protect investors and the public interest. NASDAQ may use such discretion to deny initial listing, apply additional or more stringent criteria for the initial or continued listing of particular securities, or suspend or delist particular securities based on any event, condition, or circumstance that exists or occurs that makes initial or continued listing of the securities on NASDAQ inadvisable or unwarranted in the opinion of NASDAQ, even though the securities meet all enumerated criteria for initial or continued listing on NASDAQ.

None of the enumerated market-based reasons for prohibiting a stock listing are applicable here.

48.     Nasdaq Rule IM-5101-1 also allows NASDAQ to use its discretionary authority to deny an initial listing to a company when an individual with a history of regulatory misconduct is associated with a company.   NASDAQ considers the following factors to make such that determination:

a.   The nature and severity of the conduct, taken in conjunction with the length of time since the conduct occurred;

b.   Whether the conduct involved fraud or dishonesty;

---

[19] It is typical for stock prices of a SPAC to exhibit volatility before consummating the business combinations. The price increase of MEOA's common stock and trading volume may have occurred because MEOA had delayed the shareholders meeting to vote on the Business Combination from May 24, 2023 to May 26, 2023.  Redemptions of common stock were also another potential cause of trading volatility.

c.   Whether the conduct was securities-related;

d.   Whether the investing public was involved;

e.   How the individual has been employed since the violative conduct;

f.   Whether there are continuing sanctions (either criminal or civil) against the individual;

g.   Whether the individual made restitution;

h.   Whether the company has taken effective remedial action; and

i.   The totality of the individual's relationship to the company, giving consideration to the individual's current or proposed position; the individual's current or proposed scope of authority; the extent to which the individual has responsibility for financial accounting or reporting; and the individual's equity interest.

49.   The Listing Team did not articulate a single reason in NASDAQ Rule 5101-1 to disqualify the Company's listing based on an individual's personal conduct. Nor did NASDAQ cite a single instance of violation of law or other wrongdoing to halt trading in MEOA's securities due to risks to the public interest.  NASDAQ instead imposed an open-ended trading halt with no opportunity for MEOA to cure the purported defect.  NASDAQ's trading halt could potentially continue until the Business Combination closed, which at that time was an unknown date given MEOA's ability to extend the Initial Extension Date.[20]

50.   MEOA explained that its volatility was distinct from instances where redemptions were linked to votes to extend the closing date for the SPAC transaction.  In those instances, redemptions could potentially deplete the SPAC's resources as the SPAC searched for a target.  It would be reasonable under those circumstances for NASDAQ to halt trading and to deny a cure period.  In this instance, however, MEOA intended to close the Business Combination within days. Also, shareholders who sought to redeem approximately 700,000 shares of MEOA common stock

---

[20] While waiting for NASDAQ to respond to its letter, MEOA again extended its deadline to effectuate the Business Combination to June 15, 2023, more than six months after MEOA initially applied to uplist to the NASDAQ Exchange.

could easily reverse the redemptions at any time before closing the Business Combination, and in fact, many shareholders sought to reverse the redemption of their shares as the Initial Closing Date approached and MEOA's stock price increased.

51.     Astonishingly, at or around the same time, NASDAQ allowed business combinations involving high volatility companies to proceed, presumably because it recognized that most SPACs would be unable to meet some of the metrics required to list on The NASDAQ Stock Market if it enforced all of its requirements  (e.g., round lot holders, public float, market value listed securities (**"MVLS"**), etc.).[21]  MEOA encouraged NASDAQ to consider that if it adopted the position across the SPAC market that volatility was a barrier to consummating a business combination, that position would have a far-reaching impact that would chill the SPAC market.

52.     Market factors beyond MEOA's control caused the underlying volatility in MEOA's securities.  Yet, NASDAQ selectively applied a penalty appropriate to circumstances when an individual who is associated with a public company presents issues of public concern.  NASDAQ's regulatory discretion morphed into arbitrary and capricious behavior.  On information and belief, animus toward MEOA and its mission was at the heart of NASDAQ's decision.

---

[21] The chart below provides examples of securities whose volatility increased shortly before closing business combinations and NASDAQ approved them:

| NASDAQ Trading Activity by Pre-Business Combination Special Purpose Acquisition Companies | | | | | |
|---|---|---|---|---|---|
| Symbol | Date | Trading Price | Closing Date | Closing Price | Difference |
| UHG | 1/3/2023 | $10.06 | 3/30/2023 | $20.80 | $10.74 (107% increase) |
| APLM | 1/3/2023 | $10.34 | 3/30/2023 | $24.00 | $13.65 (132% increase) |
| BAER | 1/3/2023 | $10.11 | 1/25/2023 | $22.08 | $11.97 (118% increase) |
| GRND | 10/18/2022 | $10.40 | 11/18/2022 | $36.50 | $26.1 (250% increase) |

53.     By letter dated May 29, 2023, MEOA appealed to NASDAQ's sense of fairness and requested that NASDAQ defer to the valuation contained in the Fairness Opinion. MEOA wrote that:

> Newbridge      Securities      Corporation…performed      a      Public
> Comparable Analysis, an Acquisition Comparable Analysis and a
> Discounted Cash Flow (DCF) Analysis of the estimated future
> unlevered free cash flows attributable to DTGI for the fiscal years
> of 2022 through 2031. In applying the DCF Analysis, Newbridge
> relied on the conservative financial projections prepared by DTGI,
> and its many expert advisors, that estimated certain revenue growth
> rates, as well as EBITDA and Net Income margins. Newbridge
> applied a discount rate of 14.0% and a Terminal Value Based on
> Growth in Perpetuity rate of 1.0%. The DCF Analysis resulted in a
> net present value of future cash flows of $94.3M. This information
> has been prominently disclosed in the S-4 registration statement
> filed by MEOA with the SEC.  Further, the SEC required additional
> disclosure and analysis on these matters, which has been included in
> the final proxy statement / prospectus.  The management teams and
> boards of directors of both MEOA and Digerati have agreed to these
> terms, and it is fully expected that both sets of shareholders will
> approve the transaction on such terms.

54.     MEOA offered four reasons why NASDAQ's valuation approach was flawed. First, MEOA explained that Digerati's valuation, like that of many securities that trade OTC, was depressed because Digerati received less coverage and attention by analysts, investors, and other market participants than companies that are listed on a national securities exchange.  As a result, Digerati's common stock traded thinly and lacked liquidity compared to common stocks that trade on national exchanges.  Indeed, many investors, including institutional investors, are unwilling (and have fewer opportunities) to invest in companies that are not listed on a national securities exchange, resulting in the common stock of such companies tending to trade at a *discount to the price at which such stock would trade on a national securities exchange*.

55.     Second, the overhang of Digerati's convertible and super-voting securities, which included a significant amount of convertible preferred stock, super-voting preferred stock,

warrants and convertible notes, depressed the trading volume and trading price in Digerati's stock. The Business Combination Agreement contemplated that: (i) Digerati would redeem all of the shares of Digerati's super-voting Series F Preferred Stock prior to closing the Business Combination and those shares would no longer be outstanding; (ii) all of Digerati's convertible preferred stock would convert into Digerati Common Stock immediately prior to closing the Business Combination and would be exchanged for 2,744,899 shares of New Digerati Common Stock before the closing; and (iii) Digerati would exercise the PRG Warrant for Digerati common stock immediately before closing the Business Combination in exchange for 1,379,329 shares of New Digerati common stock. As a result, these securities would no longer provide an overhang that could depress the trading volume and the trading price of the New Digerati Common Stock after the Business Combination.

56.     Third, MEOA would benefit from lower debt because of the Business Combination, which, depending upon the number of redemptions, could have resulted in MEOA having cash on its balance sheet when the Business Combination closed.

57.     Fourth, MEOA anticipated significant consolidation in Digerati's business sector, and Digerati was positioned to capture market shares following the Business Combination. Collectively, these developments supported its increased enterprise equity value.

58.     NASDAQ rejected all of MEOA's arguments.  Upon information and belief, NASDAQ was determined to use MEOA's volatility and the redemptions as a pretext to accomplishing its goal to frustrate and ultimately prohibit MEOA from completing the Business Combination.

59.     On June 2, 2023, even though NASDAQ was purportedly following an "SEC requirement," Mr. Haskell informed MEOA that NASDAQ needed to meet internally to discuss

MEOA's valuation analysis. Nevertheless, MEOA insisted that Mr. Haskell explain why NASDAQ had ambushed the Company on the eve of closing the Business Combination and required use of Digerati's OTC price, since using the publicly traded price was not standard practice. MEOA's advisors told Mr. Haskell that they were "starting to feel that they are being singled out and treated differently and/or arbitrarily." Ms. Choi responded that NASDAQ's inquiry on May 19, 2023, seeking information about "whether the OTC price was taken into account," constituted notice that MEOA must use Digerati's OTC price for valuation purposes. NASDAQ ignored MEOA's concerns, and after internal meetings, Mr. Haskell notified MEOA that NASDAQ was required to use Digerati's publicly traded price to value the business combination.

60. MEOA remained motivated to finalize the Business Combination despite the crushing news mandating use of Digerati's OTC price. MEOA explored avenues to reengineer the Business Combination such that it could comply with NASDAQ's listing standards and ultimately allow MEOA and Digerati to effectuate the terms of the Business Combination Agreement.

61. On June 9, 2023, MEOA informed NASDAQ that it would present a revised Publicly Tradable Shares form that will show that the post combination company would meet NASDAQ's listing standards. MEOA caused Digerati's convertible noteholders to become equity holders and extended the closing deadline from June 13, 2023 to June 30, 2023, hoping that finally, after jumping through yet another hoop, the Business Combination would close.

62. NASDAQ elected to use Digerati's OTC price on June 13, 2023 when Digerati traded at \$.072, ensuring that the Business Combination would not satisfy the MVLS of \$75,000,000. This was particularly frustrating given that, for the prior six consecutive weeks, Digerati's share price had traded above \$.081, which would have enabled the Business Combination to satisfy the MVLS threshold.

63.     As the possibility that the Business Combination would close began to fade, on June 22, 2023 Mr. Rochester met with Ms. Choi and Mr. Golub to make a last-ditch attempt to persuade NASDAQ to change course.  Ms. Choi and Mr. Golub stubbornly told Mr. Rochester that the SEC required that NASDAQ use the publicly traded price; that NASDAQ must follow SEC guidelines; and that NASDAQ did not have discretion to act unless SEC guidelines specifically granted NASDAQ such discretion.

64.     If this was in fact the SEC's requirement, the SEC had ample opportunities to notify MEOA of its requirement.  MEOA met with four senior personnel at the SEC to discuss MEOA's vision to use the SPAC process to raise capital formation for MBEs.  The SEC subsequently conducted five months of extensive due diligence around the Business Combination prior to MEOA's registration statement becoming effective.  If the SEC actually required SPACs to use the public trading price of a target to the extent that such a price existed, the SEC would have required MEOA to make a disclosure on its S-4 to properly inform shareholders that NASDAQ would use the public price and not the implied equity valuation for Digerati from MEOA.  The SEC did not require that disclosure from MEOA despite the fact that the SEC knew that Digerati was MEOA's business combination target; that Digerati traded on the OTC; that NASDAQ's approval of MEOA's application was a condition precedent to close the Business Combination; and that there was significant difference between Digerati's market capitalization and its implied equity value.  If the SEC required that NASDAQ use Digerati's OTC price, the SEC would have required MEOA to disclose that risk to shareholders before approving MEOA's Form S-4 and allowing it to become effective.  The SEC did not raise the price requirement with MEOA.

65.     On the July 3, 2023, after numerous attempts to satisfy NASDAQ's shifting requirements, MEOA announced that it would redeem its public shares, not consummate the Business Combination, and liquidate.

66.     NASDAQ's position was a pretext to treat MEOA differently from other SPACs. For months NASDAQ could not provide evidence of its previously unsupported position regarding use of the publicly traded price, but miraculously on July 6, 2023, an FAQ appeared on NASDAQ's website which parroted NASDAQ's position.  The FAQ reads:

> Q:     How does NASDAQ determine compliance with the price-based listing requirements in the case of a SPAC business combination where the target company is a publicly traded company?

> A:     In the case of a transaction where a SPAC acquires 100% of a publicly traded target company or is acquired by a publicly traded target company, NASDAQ generally relies on the trading price of the publicly traded target company (adjusted for any applicable exchange ratio and for the additional cash provided by the SPAC) to determine compliance with the price-based listing requirements.[22]

67.     Had this FAQ represented the SEC's policy that NASDAQ was bound to follow, this requirement would have been disclosed to MEOA during the exchange of information between January 4, 2023 and the Initial Closing Date.  If the SEC had a mandate about use of Digerati's OTC price, it would not have needed an FAQ to state *this general requirement*.

68.     And finally, had use of the publicly traded price been a requirement, NASDAQ would not have needed multiple meetings to conclude that it must deny MEOA's application to list the combined company on the NASDAQ Stock Market.

69.     On information and belief, NASDAQ did not officially change the rules in the middle of a Business Combination, as that would have been too brazen.  However, NASDAQ

---

[22] https://listingcenter.nasdaq.com/Material_search.aspx?materials=1863&mcd=LQ&criteria=2&cid=156%0A%0A

tellingly posted a new practice as soon as it denied the MEOA-Digerati business combination to cover up its misconduct.

70.     NASDAQ robbed MEOA and Digerati of innumerable commercial opportunities. Despite its statement that "[a]t Nasdaq, our purpose is to advance economic progress for all," NASDAQ proved that its purpose was hollow.   NASDAQ destroyed the opportunity for underrepresented communities to benefit equally from tools used by majority communities to access capital, pursue economic freedom, and fulfill their American Dream.

## FIRST CAUSE OF ACTION

### NASDAQ ARBITRARILY AND CAPRICIOUSLY ABUSED ITS DISCRETION TO PROHIBIT MEOA FROM COMPLETING THE BUSINESS COMBINATION IN VIOLATION OF 5 U.S.C. § 706(2)(A)

71.     Trident incorporates the preceding allegations of this Complaint in paragraphs 1 through 70 as if fully set forth herein.

72.     MEOA followed standard industry practice to list the Company on the NASDAQ Stock Market after completion of a Business Combination just like several similarly situated business combination applicants seeking to uplist to NASDAQ had done mere months before MEOA.

73.     The Fairness Opinion offered a reasonable justification of its valuation, including public comparable analysis, mergers and acquisition comparable analysis, and a discounted cash flow analysis of the estimated future unlevered free cash flows attributable to Digerati for the fiscal years of 2022 through 2031, to arrive at its proposed $10 per share valuation.

74.     Without justification or explanation, NASDAQ deviated from its recent precedent by ignoring MEOA's valuation of the combined company in favor of a significantly lower, OTC-based analysis.

75.     NASDAQ disregarded MEOA's analysis even though such an analysis is typically accepted in these circumstances as evidenced by NASDAQ's treatment of other, similarly situated transactions.

76.     NASDAQ demanded the use of a valuation methodology for MEOA that it did not require for at least three majority-controlled business combinations involving publicly traded targets that closed near the proposed closing date for the MEOA-Digerati business combination.

77.     NASDAQ deviated from its recent precedent of deferring to uplist-applicant SPACs regarding their valuation methodologies and imposed a prohibitively low valuation, backing into its desired outcome of blocking the closing of the transaction and providing no rationalization for its chosen course.

78.     NASDAQ continued to frustrate MEOA's ability to close when, after forcing the OTC valuation on it and halting trading of MEOA's stock, it cherrypicked the lowest Digerati stock price and used that price to determine whether the venture would pass the uplisting criteria.

79.     NASDAQ arbitrarily and capriciously abused its discretion to prevent MEOA from completing its Business Combination.

**SECOND CAUSE OF ACTION**

**NASDAQ'S DISPARATE TREATMENT OF MEOA BASED ON
RACE VIOLATED THE EQUAL PROTECTION CLAUSE
OF THE UNITED STATES CONSTITUTION**

80.     Trident incorporates the preceding allegations of this Complaint in paragraphs 1 through 79 as if fully set forth herein.

81.     NASDAQ, exercising its delegated authority from the SEC under the Securities and Exchange Act of 1934, functioned as an agent of the United States government, subjecting its conduct to scrutiny under the United States Constitution.

82.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits government actors from engaging in disparate treatment based on race.

83.    MEOA is part of a protected racial class under the Equal Protection Clause of the United States Constitution by virtue of its racial composition and purpose.

84.    NASDAQ deviated from its ordinary business practices when evaluating majority-led companies in SPAC transactions and applied arbitrary and capricious requirements to MEOA with the intention of blocking  MEOA's Business Combination.

85.    NASDAQ elected to disregard MEOA's valuation of Digerati even though it was supported by a Fairness Opinion from a reputable, independent third party, in favor of its own valuation formula.

86.    NASDAQ insisted that because Digerati traded on the OTC, it must use Digerati's trading price to value the combined company, knowing that it would constructively prohibit MEOA from uplisting to NASDAQ.  NASDAQ could not identify a rule, regulation or precedent that required use of its proposed valuation methodology, and when challenged, it claimed that it did not need to follow precedent.  Choi and Gollub eventually capitulated and admitted that the SEC required that NASDAQ use the OTC price and that it had no discretion to do otherwise.

87.    NASDAQ permanently halted trading in all MEOA's securities until after the transaction closed because of volatility in the stock's trading price and trading volume. In the ordinary course of a business combination, as a closing date approaches, stock prices trade with volatility due to redemption of securities.  NASDAQ's permanent halt occurred despite no evidence of wrongdoing by MEOA or Digerati, and in view of the fact that of the 13,707 NASDAQ halts in 2023, only 37 lasted more than a week.

88.     Importantly, NASDAQ allowed four companies with high volatility that were seeking to move from a junior exchange to The NASDAQ Stock Market to complete business combinations, but without justification denied the same opportunity to MEOA.

89.     NASDAQ's decision to halt trading in MEOA's stock through closing the Business Combination forced MEOA to postpone shareholder meetings to vote on the Business Combination (which it could not do without NASDAQ's approval), eroded shareholder confidence in MEOA, damaged MEOA's reputation and led to a fall in Digerati's stock price below the level where MEOA could meet NASDAQ's listing requirements using the OTC price.

90.     NASDAQ is incapable of providing a reasonable, market-centric reason for treating MEOA differently than similarly situated SPAC business combinations.

91.     Had NASDAQ treated MEOA like other similarly situated business combinations seeking to uplist from a junior exchange to The NASDAQ Stock Market, MEOA would have been able to complete this transaction which would have benefitted many minority-centric entities. Instead, NASDAQ elected to use its discretion to block this transaction, causing damages to MEOA.

92.     NASDAQ's decisions, all of which imposed standards different than those of similarly situated, non-minority-centric entities, and which all occurred within weeks of the anticipated closing, scuttled MEOA's Business Combination.

93.     NASDAQ has no compelling state interest in blocking this transaction from closing.

**THIRD CAUSE OF ACTION**

**TORTIOUS INTERFERENCE WITH
ADVANTAGEOUS BUSINESS RELATIONSHIP**

94.     Trident incorporates the preceding allegations of this Complaint in paragraphs 1 through 93 as if fully set forth herein.

95.     MEOA and Digerati entered into the Business Combination Agreement on or about August 30, 2022.

96.     NASDAQ was aware that MEOA and Digerati had executed the Business Combination Agreement.  After exchanging documents from January through May 2023, NASDAQ suddenly created roadblocks to closing the Business Combination.

97.     As described above, NASDAQ suddenly and without explanation substituted its valuation for the post-merger company in lieu of the Fairness Opinion that a reputable, independent third-party prepared related to the transition.  NASDAQ permanently halted trading in MEOA's securities purportedly due to volatility in MEOA's trading price and trading volume despite no evidence of wrongdoing and despite that other similarly situated SPACs were approved even though they traded with volatility shortly before closing their business combinations.  And NASDAQ insistence that MEOA use the Digerati OTC price of its securities even though other SPACs seeking to uplist from a junior exchange to the NASDAQ Stock Market were not required to use the target company's public price.

98.     NASDAQ cannot support its claim that it was required to use Digerati's OTC price for the post-merger valuation, and its weak rebuttal that "it did not need to provide precedent" when pressed to provide regulatory authority for its decision shows willful, malicious conduct to stop MEOA and Digerati from closing the Business Combination.

99.     The Listing Team, either individually or at the direction of NASDAQ, created insurmountable obstacles to stop MEOA and Digerati from closing the Business Combination using arbitrary and capricious regulatory decisions to reach their desired result.

100.    NASDAQ's malicious conduct caused the business combination to fail, which resulted insignificant monetary damages to MEOA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Trident prays for judgment against the Defendants as follows:

A.      As and for its First Cause of Action for arbitrarily and capriciously abusing its discretion to block the Business Combination, money damages in an amount to be determined at trial;

B.      As and for its Second Cause of Action for violation of the Equal Protection Clause of the United States Constitution, money damages in an amount to be determined at trial;

C.      As and for its Third Cause of Action for tortious interference with advantageous business relationships, money damages in an amount to be determined at trial; and

D.      For any other relief that the Court deems just and proper.


Dated: March 28, 2024
New York, New York


**BRADFORD EDWARDS LLP**

By: *Denver Edwards*
Denver G. Edwards (dedwards@bradfordedwards.com)
John K. Osei-Tutu (josei-tutu@bradfordedwards.com)

12 E. 49th Street, 11th Floor
New York, New York 10017
Phone: (917) 671.9407

*Attorneys for Trident Capital Fund I LLC*